BIRD *v.* KITCHENS.

4-8839                              221 S. W. 2d 795

Opinion delivered May 16, 1949.

Rehearing denied June 27, 1949.

*Keith & Clegg* and *Gaughan, McClellan & Gaughan,* for appellant.

*Hampton Kitchens* and *Wilson & Kimpel,* for appellee.

HOLT, J. February 14, 1933, R. S. Warnock secured a judgment in the Columbia Circuit Court for $9,945.60 against Wade Kitchens and J. B. Wilson on a joint note, signed by each, the judgment being against them as individuals.

November 10, 1933, Warnock died and his son, R. S. Warnock, Jr., was appointed administrator of his estate.

On June 2, 1936, after the lapse of more than three years, execution was issued on the judgment against Kitchens and Wilson, advertising for sale a number of tracts of land, some of which belonged to Kitchens individually, some to Wilson individually, some to them jointly, and some few tracts that neither owned were erroneously included. All the lands included in the sale in which either Kitchens or Wilson had an interest were mortgaged. The lien of the judgment had expired February 14, 1936.

For the purpose of the sale, the lands were grouped and sold by the Sheriff in four different lots. Alvin Rogers was the successful buyer, paying $500 for one lot, $1,000 for another, $1,250 for another and $2,000 for the other, or a total of $4,750. These sales began before three p. m. and concluded shortly after that hour. The sales did not divest Kitchen's wife of her dower interest.

Kitchens knew about the sale, but was not present in person. He, however, sent his secretary, Miss Stevens, to make notes on the sale and to report proceedings to him.

For some time prior to the sale Wilson and Kitchens had become estranged and were not on speaking terms, but Wilson, through emissaries, had contacted Kitchens in an effort to save their property from being sold. Kitchens refused to negotiate or take any part in the matter.

In the forenoon on the day of the sale, Wilson entered into an agreement with the administrator, Warnock, to purchase the judgment. In effect, this agreement

provided that Wilson might acquire the judgment at a discount, for $9,500, on condition, however, that the judgment in so far as it effected Wade Kitchens, should be assigned to a nominee of Wilson. Accordingly, Wilson paid the administrator $2,500 in cash, the balance to be paid in 15 days in settlement of the judgment. The Administrator, Warnock, agreed to instruct the sheriff to sell, under the execution, only lands, levied upon, belonging to Kitchens. The sheriff carried out these instructions in accordance with the agreement and sold only the Kitchens' lands, for a total of $4,750, the amount Kitchens owed as his part of the judgment. As above noted, Wilson had paid $2,500 and was personally liable for the remainder of the $9,500. On this balance due, Wilson would owe as his part $2,250, the difference between $4,750 and $2,500. Shepp Beene advanced to Wilson $5,000 and as security took an assignment of the judgment. Wilson secured $2,000 additional from another source and paid off the judgment. Thereafter, April 1, 1937, Beene assigned the judgment in question to J. B. Wilson.

It is undisputed that Kitchens did not redeem the lands which had been sold under the execution within the year allowed by statute for redemption, (Ark. Stat., 1947, § 30-441).

After the redemption period of one year had expired, the sheriff executed four separate deeds dated August 12, 1937, to Alvin Rogers, which deeds corresponded, as to lands described and amounts paid, to the four certificates of purchase. Thereafter, August 28, 1937, Alvin Rogers and wife, by quitclaim deed, conveyed the lands so conveyed to him at the execution sale, to J. B. Wilson.

The present suit was filed January 13, 1938, by Kitchens against Wilson to cancel the deeds executed, in connection with the execution sale, by the sheriff to Rogers, and the deed from Rogers and wife to Wilson.

Appellee alleged that the execution sale was void primarily because (1) at the time of the sale, Wilson and Kitchens were partners, the judgment represented a

partnership debt, the lands sold on execution were partnership lands, and that one partner could not purchase the lands of the other at such sale; (2) that the sale was also void because made after three o'clock in the afternoon; (3) the lands were sold in lots including separate tracts; (4) lands were included in the sale which did not belong to Kitchens or Wilson; (5) that there were certain erroneous descriptions; (6) the sheriff failed to make proper return of the execution; (7) the sheriff failed to file copies of the certificates of the purchase in the office of the clerk, and (8) that a trust relationship existed between the parties and for fraud on the part of Wilson. Appellee also asked for an accounting.

Defendant, Wilson, interposed a general denial, and specifically denied that a partnership relationship or a trust or fiduciary relationship existed; denied that he, Wilson, was guilty of any fraud, alleged that the execution sale was valid, and asked that appellee's complaint be dismissed for want of equity and that his, Wilson's, title to all lands embraced in the sheriff's deeds, and the deed from Alvin Rogers to him, Wilson, be quieted against any claims of appellee.

The trial court found, in effect, that a partnership relation existed between Kitchens and Wilson which had never been dissolved, that the execution sale was ineffective and should be cancelled in so far as the rights of Kitchens were concerned, because of such relationship. No specific finding was made by the court whether the sale was ineffective or void for any of the other reasons, supra, alleged and assigned by appellee.

The court further found that Kitchens and Wilson had from time to time engaged in other partnership enterprises, that all lands and other partnership assets should be converted into partnership property and that a Master should be appointed to make an accounting, and entered a decree accordingly.

This appeal followed.

Appellant, Mrs. Mary Bird, a daughter of J. B. Wilson, was made a party defendant by appellee. Refer-

ence will presently be made as to her connection with the case.

We first determine whether there existed a partnership or trust relation between Kitchens and Wilson in the lands sold at the execution sale and whether Wilson practiced a fraud on Kitchens, in the circumstances.

We have concluded, after considering the entire record, that the preponderance of the testimony shows that no partnership or trust relationship was established or existed, that no fraud was shown on the part of Wilson, and that the findings of the court to the contrary were against the preponderance of the testimony. The facts reveal that Kitchens and Wilson, for a great many years prior to about 1931, had been engaged in a number of separate joint enterprises or adventures for profit, such as purchasing lands, buying cotton and borrowing money. Each also, during this time, carried on separate undertakings and enterprises of his own without including or consulting the other.

Kitchens was a prominent attorney and also Member of Congress for a number of years. His own testimony on this relationship is most significant. He testified that he practiced law as a profession, that he had lands and other property in which Wilson had no interest, that he made deals of his own for profit and sums up their relationship in his answer to the following question: "Q. As a matter of fact each trade that was made was either put up to him by you, or by him to you, and you could come in on it or stay out, couldn't you? A. Well, I suppose so."

We hold, therefore, that they were not partners, but were dealing at arms length with a joint obligation at the time of this execution, in the circumstances, and no fiduciary relationship existed between them.

While, as indicated, since three years had elapsed after the entry of the judgment in question, the judgment lien had expired, (Ark. Stat. 1947, § 29-131). However, while the judgment lien expires at the end of this three year period, unless revived, the judgment it-

self remains in full force and effect for ten years, and the execution may be issued at any time within this ten year period, (Ark. Stat. 1947, §§ 30-103, 37-212 and 29-130).

Under the statutes, supra, appellee had the right, at any time within the one year redemption period, to make a direct attack upon the execution sale in the Circuit Court where the judgment was rendered and on which the execution was issued, for any of the irregularities alleged, supra, the sale during this redemption period being voidable and not void. He was also given the absolute right to redeem it within this period. As indicated, appellee took no action at all during the redemption period.

The Circuit Court had ample power to determine whether the sale should have been vacated, but appellee having waited until after his right to redeem had expired and the sheriff had executed the deeds to the purchaser, his right to question the sale for irregularities, such as alleged, was terminated or cut off and his present suit to void the sale is a collateral attack. After the redemption period, his right of attack was limited to defects, in the sale, which made the sale void, or for actual fraud perpetrated by appellant, Wilson.

As we have pointed out, the sale was not void, but during the redemption period was voidable only and subject to direct attack by Kitchens during this period.

The applicable and general rule is stated in 21 Am. Jur. 257, VII. Relief from Execution, as follows: "Section 517. Generally.—The fact that there is a valid judgment does not, of course, preclude an attack upon an execution sale held thereunder and a deed executed and delivered in pursuance thereof. Generally, relief should be sought, if at all, in the court from which the execution issued. * * *

"Section 519. Collateral Attack.—The general rule is that if there is any ground for relief against an execution, such relief must be sought in the original cause, and not by a new and independent proceeding. This rule is upheld of course, not merely in regard to original

writs of execution, but also in regard to alias and pluries writs of execution. The rule prevails where the collateral attack is sought to be made because of a clerical error or because of an irregularity committed by the execution officer, such as a sale made in violation of a stay of execution, or after a defective appraisement, or without any appraisement, or, in general, because of defects or irregularities in connection with the execution which do not render it void, particularly where no one sustains an injury thereby and where the sale has been confirmed. There are, however, some cases in which a confirmation of the sale is held not to preclude a collateral attack thereon. The collateral attack may be made where the execution is void, and the same remedy in certain cases of fraud. These general rules are applicable to execution deeds which may not be impeached collaterally for mere irregularity, although the defendant in execution may deny the validity of such a deed if made to one who was not the purchaser, but a stranger to the proceedings.''

Appellant, Mrs. Mary Bird: Nearly a year after the filing of the present suit, appellee, as indicated, by amendment to his complaint, made Mrs. Bird a party. He alleged that a deed of trust given by Wade Kitchens and J. B. Wilson to Clyde Fincher, trustee for T. P. Lester, had been foreclosed and judgment rendered October 26, 1936, against Kitchens and Wilson for $6,844.44 plus interest; that this judgment was assigned by Lester to Mrs. Bird December 30, 1936, for $7,000; that the lands described in the deed of trust were sold and purchased by Mrs. Bird September 11, 1937; that Kitchens redeemed the lands by paying to the Clerk September 10, 1938, $8,303.13, and this money was paid by the Clerk to Mrs. Bird. It thus appears that Kitchens has paid $8,303.13 to satisfy a judgment for which he was liable for only one-half. Appellant so concedes and says: ''One-half of the judgment was the debt of Mr. Wilson and he should be accountable for one-half of the amount paid by Kitchens to satisfy the Lester judgment.''

It appears, however, that the trial court made no finding as to the amount due from Wilson to Kitchens

on this particular transaction, it appearing that an accounting would be necessary in order to determine the interest of each party after allowing certain credits. The proof was not fully developed, and this joint transaction, along with others, not determined, was reserved for further proceedings, involving an accounting.

Accordingly, the decree is reversed and the cause remanded with directions to quiet appellants' title to all the lands sold at the execution sale and described in the sheriff's deeds in which Wilson and appellee, Kitchens, had any interest, to give appellants possession and for further proceedings consistent with this opinion.

Griffin Smith, C. J., dissents in part.

Justice McFaddin concurs.

ED. F. McFADDIN, Justice (concurring). Assuming the decree here involved is final and appealable (which is a point not discussed by either side, but one concerning which I am in doubt), then I reach the conclusion that, as regards all of the lands except those in the Lester foreslosure, Kitchens is barred by limitations and laches from maintaining this present suit. I arrive at this conclusion by a process of reasoning different from what is reflected in the majority opinion, hence this concurrence:

1. At most, the relationship between Kitchens and Wilson in their various dealings, until June 2, 1946, was that of joint adventurers. They did not engage in a general line of business; each separate transaction was dependent on mutual agreement. Kitchens was interrogated, and answered:

"Q. As a matter of fact, each trade that was made was either put up to him by you or by him to you, and you could come in or stay out, couldn't you?

"A. Well, I suppose so."

For definition and discussion on joint adventurers, see 30 Am. Juris. 677, 33 C. J. 841, 48 C. J. S. 801 and Annotation in 138 A. L. R. 968.

2. On June 2, 1936, the joint adventure relationship definitely ceased between Kitchens and Wilson. Kitchens testified that on that date and by invitation he attended a meeting in Wilson's office to seek a solution of their difficulties, but that when a certain attorney appeared as representing Wilson, then Kitchens (to quote him)

". . . got up and said, 'Ill have nothing to do with it,' and I walked out and have never been back.

. . . . .

Q. So after this meeting there . . . , did you realize it was up to you to protect your own interest the best way you could without help from Mr. Wilson?

A. Sure, I thought I was doing that.

Q. You were not getting any help from him, you knew that?

A. Yes, I knew it.

Q. And you didn't expect any from him after that time?

A. No, sir.''

Other evidence shows that nothing but hostility existed between Kitchens and Wilson after June 2, 1946. Under all the evidence, that day marked the end of their joint adventure, and left each free to deal with the other at arms' length.

3. With Wilson and Kitchens dealing at arms' length, Kitchens should have exercised his rights before they were lost by limitations and laches. Instead, he waited past the year to attempt to redeem from the execution sale, and waited until oil had been discovered near some of the lands, before taking steps to claim any alleged rights. Thus, limitations and laches bar him from maintaining the present suit.

GRIFFIN SMITH, Chief Justice, dissenting in part. I am not certain that "partnership" was the proper word for the Chancellor to use in connection with the relationship between Kitchens and Wilson. Perhaps not.

However, to me a preponderance of the evidence is persuasive that in respect of numerous transactions Kitchens and Wilson were jointly interested, and were not—as the majority opinion finds—at all times dealing at arm's length. In some cases there was apparent mutuality when purchases were made, hence each occupied toward the other a position of trust. The Chancellor found that a master should examine all of these transactions, take proof regarding their origin, the duration of ownership, and final disposition of the holdings, and state an account. I do not think the record before us is sufficient for determination of the equities, hence in this action I would merely sustain what in effect the Chancellor found generally—that a trust relationship existed, requiring all of the facts to be developed. It would then be appropriate to review the facts and say whether liability exists.