**UNITED STATES of America,
Plaintiff,**

v.

**James WEIR, Defendant.
No. LR–60–C–146.**

United States District Court
E. D. Arkansas, W. D.
Nov. 14, 1963.
On Motion for New Trial or Rehearing
March 30, 1964.

James M. Barker, Jr., Hamburg, Ark., William Drew, Lake Village, Ark., and James P. Donovan, Dallas, Tex., for defendant.

Robert D. Smith, Jr., U. S. Atty., and James W. Gallman, Asst. U. S. Atty., for plaintiff.

HENLEY, Chief Judge.

This protracted case is now before the Court on the motion of defendant, James Weir, hereinafter at times called movant, to set aside an execution sale conducted by the Marshal whereby Weir's interest in approximately 1,000 acres of land in Chicot County, Arkansas, was sold to L. J. Warren of Lake Providence, Louisiana, for a price of $60,000. The assignees of Warren, hereinafter called respondents, resist Weir's motion and have filed a petition of their own seeking confirmation of the sale, issuance of a Marshal's deed to the premises, the issuance of a writ of assistance to put them in possession of the land, and an injunction restraining Weir from interfering with their possession. Respondents also seek any other relief to which they may have shown themselves to be entitled.

The matter has been heard in open court, and has been submitted on the record in the case, oral testimony, and written briefs. This memorandum in-

corporates the Court's findings of fact and conclusions of law with respect to the issues presented.

The lands in question were acquired by movant in 1955, and prior to the sale which took place in April 1962 were owned by movant, subject to a mortgage in favor of The Connecticut Mutual Life Insurance Company. In 1959 movant had a rice allotment of ten acres. He deliberately overplanted this allotment very substantially, and the Government commenced this suit against him to recover penalties as provided by the Agricultural Adjustment Act of 1938, as amended and supplemented, hereinafter at times called the Act.[1]

Movant resisted the claim of the Government and in connection with his defense he was represented by a firm of attorneys from Dallas, Texas, and by local counsel. It was contended by Weir that the Act was unconstitutional, that the Act imposed no personal liability for penalties on farmers who produced commodities in violation of the Act, that the rice produced by him in 1959 was intended to be sold as seed rice and was not covered by the Act, that he did not plant as much rice as the Government contended, and that he had been discriminated against by the local officials administering the rice program in Chicot County.

The case having come to issue the Government filed a motion for summary judgment which the Court granted on February 12, 1962. Judgment in favor of the Government was entered in the sum of $16,972.09 plus six percent interest from March 23, 1960. The judgment itself bore interest at six percent from date of rendition. Movant appealed and the judgment was affirmed. Weir v. United States, 8 Cir., 310 F.2d 149.

Although movant was advised repeatedly that he could stay execution of the judgment pending the appeal by posting a supersedeas bond, he refused to supersede and obtained no stay.

On February 28, 1962, on application of the United States Attorney the Clerk issued a writ of execution commanding the Marshal to make of the goods and chattels, lands and tenements of Weir within this District the sum of $16,972.-09 principal, plus accrued interest in the sum of $1,965.92 and costs amounting to $59.80.

On March 5, 1962, the Marshal, acting through one of his deputies, Bob E. Powell, served the writ on Weir at his home in Dermott, Arkansas, and after making an unsuccessful effort to levy on personal property made his levy on Weir's farm. The sale was held on the afternoon of April 17, 1962, and the successful bidder was Captan Jack Wyly, an attorney of Lake Providence, who, along with Carneal Warfield of Lake Village, Arkansas, was representing Weir at the time. By prearrangement Wyly was bidding for Warren, and it was understood that Warren was acquiring the property for movant's benefit. It seems to have been movant's intention at the time to redeem or to bring about a redemption of the land within the one year period allowed for redemption by Ark.Stats.1947, § 30-440. However, it appears from the testimony taken in connection with the instant motion that Weir did not expect to pay or cause to be paid in redemption more than about $23,000; he seems never to have contemplated having to pay $60,000 plus interest on that sum.

On September 28, 1962, Warren assigned his certificate of purchase to respondents in consideration of their payment to the Marshal of the bid price of $60,000 plus interest. The amount paid to the Marshal by respondents was $61,639.34. That sum, of course, was more than sufficient to discharge the judgment rendered in this particular case, but at the time of the payment there were pending in the Pine Bluff Division of this District three other suits brought by the Government against Weir to collect additional penalties under the Act. In view of the pendency of those

---

1. 7 U.S.C.A. §§ 1281 et seq., particularly §§ 1351–1356.

cases, the Marshal, at the request or direction of the United States Attorney, after paying off the judgment in this case impounded the balance of the funds in his hands, and as the other suits against Weir went to judgment those judgments were satisfied out of the impounded funds.

Movant's period of redemption expired on April 17, 1963. He failed to redeem, and on April 19 filed the instant motion. When the motion was filed, the Marshal had not issued a deed to respondents and the issuance of a deed was held in abeyance pending disposition of the motion.

Movant contends first, and principally, that he was not permitted to select personal property to be sold in satisfaction of the execution, as provided by Ark. Stats.1947, § 30–401, and that the lands were not subdivided into tracts for purposes of sale, as provided by Ark.Stats. 1947, §§ 30–421 and 30–422. He also contends that the lands sold for a grossly inadequate price, and the Court is willing to assume, although the matter is by no means clear, that he contends that the Marshal made an excessive levy.

Before discussing the controlling facts the Court considers it desirable to quote the Arkansas statutes just mentioned, and to comment upon them.

Section 30–401, derived from the Revised Statutes of Arkansas, ch. 60, § 28, is as follows:

"*Selection of property to be sold—Levy.*—The person against whom any execution may be issued may select what property, real or personal, shall be sold to satisfy the same; and if he give to the officer a list of the property so selected, sufficient to satisfy such execution, the officer shall levy upon such property and no other, if it be sufficient in his opinion to satisfy such execution, and if not, then upon such additional property as shall be sufficient."

Sections 30–421 and 30–422, derived from Act 37 of 1868, presuppose that real property is to be sold in satisfaction of an execution. Those sections are as follows:

"30–421. *Division of real estate into tracts.*—In all sales of real estate, under execution, when the tract or tracts to be sold contain more than forty [40] acres, the same shall be divided, as the owner or owners may direct, into lots containing not more than forty [40] nor less than twenty [20] acres, and the officer whose duty it may be to sell said property, shall begin at one corner of said real estate, to be designated in the notice published by him advertising said sale, and proceed to sell in such tracts of not more than forty [40] nor less than twenty [20] acres each, of contiguous territory, unless * the whole of said tract or tracts be disposed of, unless the execution shall be sooner satisfied.

"30–422. *Corner where sale of tracts commenced.*—In all cases where the corner at which the sale is to commence has not been designated in accordance with section one [§ 30–421] of this act, the officer whose duty it may be to sell said tract or tracts of land, shall commence at the northeast corner as required in section two [2] of this act."

It is apparent that section 30–401 does not impose upon the officer serving a writ of execution a mandatory duty to levy upon personal property in preference to real estate or to refrain from seizing real estate as long as there is available personalty. That section merely gives to the judgment debtor the right or privilege of selecting in the first instance the property, whether real or personal, which he desires to have sold in satisfaction of the judgment. Wade v. Deniston, 180 Ark. 326, 21 S.W.2d 424. The statute was designed for the benefit of judgment debtors, and where a judgment debtor takes no action to

* In the Act of 1868 "unless" is "until".

avail himself of that benefit, he waives it. Trapnall v. Richardson, Waterman & Co., 13 Ark. 546, 549; see also 21 Am.Jur., Executions, § 376, 33 C.J.S. Executions § 95b.

■ Nor is section 30–421 a self-executing statute. It does not come into operation unless and until the owner directs the subdivision of his property for the purpose of sale, and if the owner gives no such direction, and if the property is sold *in solido* without objection to the mode of sale the right conferred by the statute is lost. In Reynolds v. Tenant, 51 Ark. 84, 9 S.W. 857, it was said (pp. 87–88 of 51 Ark., p. 858 of 9 S.W.):

"The sale of the land was made in a body. This, it is contended, is in violation of the statute * * *. This requirement has been held by this court to be directory, and at the option of the owner, and may be waived. In this case the owner was present at the sale, and did not ask that the land be divided up according to the statute, or object to the sale. The requirement of the statute was for his benefit. He did not ask the sheriff to comply with it. He had a right to waive it, and did so by his failure to demand it. It does not appear that the land failed to bring a fair price. Feild v. Dortch, 34 Ark. 399; Youngblood v. Cunningham, 38 Ark. 571."

Returning now to the facts, the evidence discloses that on March 5, 1962, Deputy Marshal Powell went to the home of movant in Dermott and served the writ of execution upon him. In connection with the service Powell at least attempted to explain to Mr. Weir his right to pay the judgment, or to post a supersedeas bond, or to select specific property for sale.[2] Powell testified that he did in fact explain those rights to Weir, and

that Weir said that he would not pay the judgment, that he would not post a bond, and that the Marshal's office was not going to seize anything. Weir's version of the conversation at his home in Dermott varies somewhat from that of Powell. Weir denies that Powell pointed out to him the available alternatives just mentioned. According to Weir, Powell started to say something which he had been directed to tell Weir by the United States Attorney, but Weir refused to hear what Powell was about to say and either ordered him or requested him to leave the house.

Whether one accepts Powell's version or Weir's as to what was said at the house, it is undisputed that later on the same day Powell went to the Weir farm for the purpose of levying on personal property. He discovered the locked barn and the grain bins which have been mentioned; he also saw a single piece of equipment, which Weir testified was a bulldozer, and which Powell thought was in poor condition. Powell could not see what was in the barn, and he could not tell what, if anything, was in the bins or the condition of their contents. Faced with this situation Powell went to a telephone and called Weir with the request that he open the barn and the bins so that Powell could make his levy. This Weir vehemently refused to do and warned Powell not to seize any property.

While it does not appear from the evidence that Weir expressly threatened Powell, the evidence does disclose, and Weir does not deny, that his attitude was menacing. When Weir refused to come to the farm as requested by Powell, the latter telephoned James W. Gallman, an Assistant United States Attorney at Little Rock, and after conferring with Gallman made his levy on the land.

The sale of the property was duly advertised for April 17, 1962. Shortly be-

2. There is no question that Weir had sufficient unencumbered personal property to satisfy the judgment. That property consisted principally of the rice which was the subject of the lawsuit in the first place, farming equipment, and motor vehicles. Most of the farming implements and equipment were located in a locked barn on the Weir farm, and the rice was stored in locked bins also located on the farm.

fore the sale Weir filed an application to enjoin it. The application, obviously prepared by an attorney, attacked the levy on various grounds, but no point was made that Weir had not been permitted to make a selection of property or that the land was advertised for sale in a block.

In its order denying the application, entered on April 16, the Court pointed out that it did not appear that Weir had availed himself "of the rights of selection provided by Ark.Stats. 30–401, 30–421, 30–422." A copy of that order was mailed to Weir, and it appears that he received it on the morning of April 17. The sale was held during the afternoon.

On the morning of April 17 Deputy Marshal Powell was accompanied to Lake Village, the county seat of Chicot County, by the United States Attorney and the Regional Attorney for the Department of Agriculture. Mr. Weir was present, along with Mr. Wyly, Mr. Warfield, Mr. Warren, Mr. Charles A. Smith, and Mr. W. R. Smith. Messrs. Wyly, Warfield, and Warren have been identified already. The Messrs. Smith are farmers and close friends of Weir.

The United States Attorney and the Regional Attorney were both desirous of avoiding a sale of Weir's farm and they entered into extended negotiations with Weir's friends and advisers in an effort to settle the case. In addition, the United States Attorney specifically told Weir that he could file a supersedeas bond, and there were friends of Weir present who would have signed the bond as sureties and who would have been satisfactory as such.[3] Weir discussed the matter with Wyly, and Wyly advised him to let the sale go on, and stated that "It will hurt them more than it will us. Let the bell ring." Movant took Wyly's advice and refused to execute the bond.

By the time this decision was reached about 100 people, mostly friendly to Weir, had gathered around the courthouse to witness the sale. As the Marshal was about to call for bids, Charles A. Smith, who has been mentioned proceeded to make an inflammatory speech to the effect that Weir had been mistreated, that he had been denied due process of law, that his wife had an interest in the property, that the sale would be illegal, and that the purchaser would not acquire good title.

The Government had on hand as a bidder one Birchfield, an employee of the Chicot County ASC Committee. While it is not entirely clear, it seems inferable that Birchfield bid the amount of the Government's judgment, plus interest and costs, and his bid was raised somewhat by Wyly. At this point a Mr. McBride, who seems to have had no connection with the Government or with Weir, other than as an acquaintance, entered the bidding, and he and Wyly began to bid against each other. When Wyly made his final bid, Charles A. Smith shook his head at McBride as a signal to him to stop bidding, and McBride made no further bids.

As stated, the crowd at the sale was generally friendly to Weir, and Mr. Smith admitted in his testimony that there was a general understanding that the land was to be bid in for Weir's ultimate benefit, and that the price would be kept down. With regard to the speech which he made before the bidding commenced Smith testified that he spoke of his own volition and not at Weir's instigation, and this may be true. However, the Court notes that Weir and his attorneys were present and did not disavow Smith's remarks.

Following the sale but before the purchase money was paid to the Marshal, Mr. Wyly worked out an arrangement with the United States Attorney whereby the rice which had brought about the suit

---

3. Since the farm even subject to the insurance company's mortgage was unquestionably worth more than the Government's judgment, the requiring of sureties on the supersedeas bond was more or less of a formality. Actually, Weir's own signature on the bond would have been adequate security at least at that time.

would be sold and the Government's judgment, that is to say the penalties of the Act plus interest and costs, would be paid out of the proceeds with the surplus being turned over to Weir. Had this agreement been carried out, it seems clear that Mr. Warren would have released his rights under his certificate of purchase, and that would have been the end of the matter, at least as far as this particular case was concerned. Weir, however, refused to carry out the agreement and discharged Mr. Wyly as his attorney. Mr. Weir testified that he refused to carry out the agreement because the Government insisted that it be named as a joint payee with Weir in any checks that might be given in payment for the rice. Weir stated that other farmers were not treated in that manner, and that he refused to go along with such a procedure. Actually, Weir was simply unwilling to pay the Government the amount of its judgment.

When the facts above outlined are considered in the light of the principles which have been mentioned, the Court is convinced that Mr. Weir has waived the benefits of Ark.Stats. §§ 30–401, 30–421, and 30–422, and that he is estopped by his conduct from complaining of the conduct of the sale, any inadequacy of the price obtained for the land, and any excessiveness in the Marshal's levy.

Mr. Weir not only failed to designate any property for sale or to request that his land be subdivided for sale purposes. He knowingly and intentionally refused to make any selection of property and forbade the Marshal to make any seizure of any personal property. He refused either to pay the judgment or to supersede it, and he and his friends conspired to keep the bidding down, with friend Smith going so far as to make the speech which has been described. From its consideration of the entire record the Court is convinced that for reasons about which

the Court need not speculate, but which seemed good and sufficient to Weir at the time, he wanted his entire farm sold, if there was going to be a sale at all, and he wanted it sold at the lowest price possible. Because of McBride's participation the bidding may have gotten out of hand, and the ultimate impounding of the entire purchase price paid to the Marshal may have been unanticipated by Weir, but those matters are immaterial to the validity of the sale.

With further regard to the alleged inadequacy of price and with regard to the alleged excessiveness of the levy, the Court is not persuaded that the levy was excessive or that the price received was actually inadequate. It must be remembered in this connection that the land was subject to a first mortgage. While the record does not disclose the exact amount of the debt secured by the mortgage as of the time of the sale, the original amount of the debt was $60,000, payable at the rate of $3,000 per year beginning January 1, 1959, and the debt bore interest on unpaid principal at the rate of five percent per annum. Further, Mr. Weir was a married man, and under Arkansas law an execution sale does not cut off a wife's right of dower. That right, while inchoate during the husband's lifetime, is a lien on the land, and a purchaser at an execution sale takes subject to it. The dower right becomes vested upon the death of the husband, and the wife has seven years after his death to secure an allotment of her dower. See Humphreys v. McKnight, 202 Ark. 715, 152 S.W.2d 567; Roetzel v. Beal, 196 Ark. 5, 116 S.W.2d 591.

Taking into consideration the mortgage, Mrs. Weir's dower interest, the small rice allotment of the Weir farm, and possibly the farm's small allotments of acreage for the planting of other controlled crops,[4] the Court simply is unable to say that the Marshal made an exces-

4. Laying to one side Mr. Weir's claims of unfair treatment at the hands of the Chicot County ASC Committee, which claims have no support in the record in this case, Weir's basic acreage difficulties stem from the fact that his farm has little, if any, "crop history." Weir testified that when he bought the property, it was largely uncleared, and that he has cleared it up and put it in shape for cultivation.

-sive levy or that a bid of $60,000 for Weir's interest in the land, subject to the mortgage and subject to the dower interest, which might well make the title unmerchantable, was grossly or even substantially inadequate.

But even if it be assumed that the price was inadequate, it is well settled in Arkansas that mere inadequacy of price, no matter how gross, is not alone sufficient to vitiate an execution sale. Carden v. Lane, 48 Ark. 216, 2 S.W. 709; Pindall v. Trevor, 30 Ark. 249; Newton's Heirs v. State Bank, 22 Ark. 19; Brittin v. Handy, 20 Ark. 381; Hardy v: Heard, 15 Ark. 184. Nor will inadequacy of price, standing alone, justify a court of equity in refusing to confirm a judicial sale. Hinton v. Elliott, 187 Ark. 907, 63 S.W.2d 633; Wells v. Lenox, 108 Ark. 366, 159 S.W. 1099.

While movant contends that an alleged suppression of bidding, presumably by Charles A. Smith, is a factor in the case which should be added to the alleged inadequacy of price so as to vitiate the sale, it is clear that once the bidding passed the amount of the Government's judgment, including interest and costs, it was in movant's interest for the bidding to be kept low. Moreover, if Smith in fact "suppressed" the bidding either by his speech or by his indication to McBride that he should cease bidding, this "suppression" was for the benefit of Weir, or for what Smith thought was for Weir's benefit, and, although Weir may not have instigated or expressly authorized the conduct of Smith, he certainly did not disapprove of it.

At the commencement of the hearing movant filed in open court a supplement to his original motion. In that pleading he sought to advance one contention which he had advanced when the case was before the Court on the merits, and which is not now open. He also advanced two constitutional contentions which the Court finds to be so insubstantial as to require neither statement nor discussion.

It is argued by respondents that since the motion under consideration was not filed until after movant's period of redemption had expired, the sale cannot be set aside except for defects which would have rendered it void absolutely, and that the defects upon which movant relies would at most have made the sale voidable. Cf. Bird v. Kitchens, 215 Ark. 609, 221 S.W.2d 795. However, since the Court is convinced that none of movant's contentions has merit, it becomes unnecessary for the Court to pass upon respondents' contention just mentioned or on their contention that they are bona fide purchasers for value and without notice and are entitled to protection as such.

Movant's motion will be denied, and respondents will be granted affirmative relief on their own petition. An appropriate order is being filed contemporaneously with this opinion.

The Court is not willing to bring this memorandum to a close without making certain general observations about the case. Throughout the entire proceedings Mr. Weir has sought to create the impression that he has been persecuted by the Government. Such is simply not the case, at least as far as the Marshal's office and the United States Attorney's office are concerned. Mr. Weir's present predicament is due to his deliberate violation of the Agricultural Adjustment Act in 1959, and to his deliberate refusal either to supersede or to pay the judgment rendered in this case. Mr. Weir, of course, had and has every right to be opposed to the Government's farm program. Many people are. And he had the right to carry his opposition to the extent of litigation, as he did; but, he should have foreseen that he might lose the case and should have been prepared for the consequences. He could not avoid losing the case, but he could have avoided losing his farm. It is unfortunate that he has lost both.

### On Motion for New Trial or Rehearing

This cause is now before the Court on the motion of defendant, James Weir,

for a new trial or a rehearing with respect to the order of this Court overruling Weir's motion to vacate and set aside an execution sale of his interest in certain lands in Chicot County, Arkansas, which sale was conducted by the Marshal following the Court's rendition of summary judgment in favor of the plaintiff.[1] The motion has been submitted on the entire record in the case, memorandum briefs, and oral argument. The Court is convinced from its consideration of the materials before it that the motion is without merit and must be overruled.

The Court finds it unnecessary to discuss all of the averments of the motion. However, Weir's principal contentions call for some comment.

1. Following the entry of the Court's original judgment the Government sued out a writ of execution (fieri facias), and the sale was conducted pursuant to that writ. The procedure followed was that prescribed by the laws of Arkansas for the conduct of execution sales. See Rule 69(a), Federal Rules of Civil Procedure, 28 U.S.C.A. No effort was made to comply with the requirements of 28 U.S.C.A., sections 2001 and 2002 which relate to sales of realty under any order, judgment or decree of a United States District Court. It is claimed by movant that this non-compliance with the sections just mentioned rendered the sale void.

When the validity of the sale was attacked originally, the non-compliance with the federal statute was not asserted as a ground of attack, and it may be doubted that the contention based upon that statute should be considered when raised for the first time in connection with a motion for a new trial.

Aside from that, however, the Court is convinced that the federal statute, which is derived from the Act of March 3, 1893, Ch. 225, 27 Stat. 751, relates only to judicial sales, and has no application to execution sales. The original statute was so construed in Yazoo & Mississippi Valley R. Co. v. City of Clarksdale, 257 U.S. 10, 18–19, 42 S.Ct. 27, 66 L.Ed. 104, and was likewise so construed in Prudential Insurance Co. of America v. Land Estates, Inc., 2 Cir., 90 F.2d 457, and Champion Box Co. v. Manatee Crate Co., 5 Cir., 75 F.2d 340.

In the Clarksdale case, supra, the Court said (p. 19 of 257 U.S., p. 29 of 42 S.Ct.) :.

"We think that the language of this act limits its application to judicial sales made under order or decree of the court and requiring confirmation by the court for their validity, and that it does not extend to sales under common-law executions which issue by mere praecipe of the judgment creditor on the judgment without order of the court, and in which the levy and sale of the marshal are ministerial, do not need confirmation to give them effect, and only come under judicial supervision on complaint of either party. The sale in such a case depends for its validity on the marshal's compliance with the requirements of law. * * "

And in the Prudential case, supra, it was said (p. 458 of 90 F.2d) :

" * * * (The statute) is limited in its application to judicial sales made under order or decree of the court and require confirmation by the court for their validity. * * * A judicial sale is one made by the court through a duly appointed and

1. The sale was conducted in 1962 and Weir's interest in the lands involved was sold to L. J. Warren of Lake Providence, Louisiana. Subsequently, Mr. Warren assigned his certificate of purchase to Captan Jack Wyly and others, and the assignees are opposing Weir's present motion. The original motion to set the sale aside was not filed until more than a year after the sale took place. That motion was overruled on November 14, 1963, and the instant motion was then filed, as were other motions and counter motions. In January of the current year the assignees commenced a plenary suit against Weir which action has for its purpose the eviction of Weir from the lands which were the subject of the sale. Following a hearing on February 5, 1964, the Court's order of November 14, 1963, was amended in certain respects not pertinent to this opinion.

commissioned officer, the essential element being that the court assumes the character of seller. * * * "

In the instant case the judgment which the Court rendered did not order the sale of any property of Mr. Weir, either realty or personalty. The Court simply rendered a money judgment for a penalty in favor of the United States, and execution issued upon the request of the United States Attorney.

In an effort to escape the force of the cases above cited counsel for Weir contends that the statute has been amended since those cases were decided, and that the statute now applies to execution sales. The Court has carefully examined the original Act as it appears in the Statutes at Large and has also examined later statutes which have amended the original Act. While the language of the Act has been modified to some extent, the Court sees nothing in the modifications which would indicate any Congressional intent to make the statute applicable to ordinary execution sales. With certain exceptions and modifications not here relevant, it is essentially the same statute that it was when first enacted.

 2. It is contended that the Marshal's levy on Weir's property was excessive, and that the Court erred in refusing to enjoin the sale. Weir's application for an injunction was not filed until the day before the sale was scheduled to take place. The Government responded to the application promptly, and the application was denied by the Court. In its order denying the application the Court stated that it could not be determined at that time or indeed until after the sale whether the levy was excessive, and the Court feels that it was correct in that connection. Further, as the Court pointed out in its memorandum opinion accompanying its order of November 14, 1963, the Court is not persuaded that in the circumstances the levy was excessive.

The argument that the Court erred in refusing to enjoin the sale seems to be based in part on the theory that the federal statutes which have been mentioned were applicable and that the Marshal had no right to proceed under State law. That argument is answered fully by the holding that the federal statutes were not applicable.

 A further contention is made that the application for an injunction amounted to the exercise of selection rights under Ark.Stats.1947, §§ 30–401, 30–421, and 30–422. The Court did not at the time consider, and does not now consider, that the application for injunctive relief was in any sense an attempt to exercise rights under the Arkansas statutes, and in its order denying the application the Court said: " * * * it does not appear that defendant has sought to avail himself of the rights of selection provided by Ark.Stats. 30–401, 30–421, 30–422."

3. It is contended further that assuming that the conduct of the sale was governed by Arkansas rather than by federal law the Court erred in holding that Weir waived his rights under the Arkansas statutes referred to in the preceding portion of the opinion. The Court discussed the matter of waiver fully in its opinion of November 14, 1963, and will not repeat that discussion. The Court adheres to its view that Weir effectively waived his rights under the Arkansas statutes.

4. In connection with his motion Weir now asserts that the bins in which his rice was stored were not locked, and that the Marshal could and should have levied on the rice in preference to the land. This assertion is somewhat surprising in view of the testimony which the Court heard at the hearing which was held in connection with Weir's original attack on the sale. That testimony was to the effect that the bins were locked, that the Marshal requested Weir to come out to his farm and open his barn and the bins so that the Marshal could make a levy on personal property, and that Weir refused to do so. In his own testimony at that

hearing Weir did not indicate that the bins were unlocked and neither did his witness, Charles H. Smith. The Court found that the bins and barn were locked, and that Weir refused to open them. Those findings will not be disturbed. Further, as pointed out in the Court's November memorandum the Marshal was not under a mandatory duty to seize personalty in preference to realty in the absence of a selection by Weir, and Weir refused to make any selection.

5. In the motion and in the course of his argument counsel for Weir takes exception to certain findings of the Court relative to Weir's failure to supersede the original judgment of the Court pending his unsuccessful appeal to the Court of Appeals. It is argued in effect that the Court told Weir that his farm could not stand for the judgment, and that he would be required to post either a cash bond or a paper bond with a corporate surety thereon. That argument is based on what is at best a misunderstanding of what transpired between the Court and Mr. Weir prior to the sale.

The record reflects that on April 4, 1962, about two weeks before the sale, Mr. Weir filed a "request for delay in execution of judgment." In that pleading he asked that execution be stayed pending his appeal. He did not post or offer to post a bond of any kind. On or about April 12, 1962, the Court had a conversation with Mr. Weir in the course of which Weir indicated that he wanted the sale stayed but was unwilling to post a bond. He insisted that the property which had been seized was worth much more than the judgment against him and constituted adequate security.

The Court pointed out to Mr. Weir that in order to stay the sale he would have to post a bond, but that if the value of his land approached the valuation which he put upon it, he would have no difficulty making a personal bond. And in the Court's order of April 12 denying Weir's application for a stay it was stated expressly that the judgment would be stayed upon Weir's posting a supersedeas bond in the sum of $23,000, conditioned as prescribed by law, and "with qualified corporate surety thereon, or with one or more personal qualified sureties to be approved by the Court."

In view of the value of the land, had Weir tendered a bond signed by him and by any other person, it would have in all probability been approved as a matter of course, but, as indicated, Weir refused to file any bond of any kind. In addition, as stated in the November opinion, Weir had the opportunity to supersede down to the moment of the sale, and he had friends present at the sale who were ready and willing to sign a supersedeas bond as Weir's sureties thereon.

6. The final point to be discussed is the contention that Weir has been denied procedural due process. It is quite true that the Court has not held a formal hearing in connection with every pleading which Weir has filed in this case. But, every contention that he has advanced has been considered carefully, to the extent that Weir was entitled to have it considered in this action, and his contentions have been passed upon in the manner in which such contentions are usually handled in this District under the local rules of the Court. The Court is fully convinced that the procedures followed here have not prejudiced any of Weir's rights and that he has been accorded both substantive and procedural due process.

This has been a long drawn out and hard fought case. The order which is about to be entered will not terminate the controversy between Weir and his adversaries, but subject to Weir's right to appeal it will put an end to this particular lawsuit. Remaining issues between the parties will have to be threshed out in the new suit which has been mentioned or in still other litigation.