DAVIDSON v. SANDERS.

5-2676                                    357 S. W. 2d 510

Opinion delivered May 28, 1962.

162

*Dinning & Dinning* and *Burke & Roscopf*, for appellant.

*George K. Cracraft, Jr.*, for appellee.

CARLETON HARRIS, Chief Justice. This is an action by appellees, as children, grandchildren, and great grandchildren of Andrew Williams, deceased, who was the owner of certain lands in Phillips county (120 acres, more or less), against Otis Williams, grandson of Andrew Williams, alleging that they were the owners of such lands, through inheritance, as tenants in common; that though they had conveyed their interests in the lands to Otis Williams, and he thereby held legal title, appellant was actually holding the lands in trust for them. It was alleged that the title was placed in appellant for the sole purpose of obtaining a loan to pay off indebtedness against the property; that Otis Williams was to have the use of said lands "and as soon as the rents and profits were sufficient to pay said indebtedness that said lands would then be conveyed back to said heirs according to their original interests therein"; that demand had been made upon Williams to convey the property back, but that he had failed and refused to do so. Appellant

answered, asserting, *inter alia*, that he was the owner of said lands, denying that he had made any agreement, verbal or written, to reconvey to appellees any part or portion of the lands involved in the proceedings, and specifically pleading the statute of frauds, laches, estoppel, and the five year statute of limitations applying to the commencement of actions against purchasers at judicial sales. Appellant, Abe J. Davidson, asserted that he held a mortgage on the property to cover advances made for the benefit of appellant Otis Williams, and that he was due the sum of $22,373.71, which amount constituted a first lien upon the property, and was superior to any claim of appellees. Davidson further alleged that if there was an agreement between Otis Williams and appellees to reconvey the property, he (Davidson) had no notice of same, and had made his advances to appellant Williams in good faith, and without any notice of any possible defect in title. At the conclusion of the trial, which covered several days, the court entered its decree, finding that Otis Williams held legal title to the lands in question, but "that said legal title now held by Otis Williams is held in trust nevertheless for the following named persons, to-wit:

Carrie Sanders, an undivided 1/6th interest

Martha Smith, an undivided 1/6th interest

The heirs at law of Julia Sawyer, an undivided 1/6th interest

Otis Williams, an undivided 1/2 interest.

The court further finds that the heirs of Julia Sawyer are:

Nora Laws

Maurice Laws

Ira Laws

Katie Laws Sims

Catherine Laws

Walter Laws

Hazel Laws

Elnora Sawyer Griffin

Mary Sawyer Shaw

Jessie Sawyer

Gill Sawyer

Annie Rankins

Marie Vanderbilt

Each of whom is entitled to an undivided 1/78th interest of said trust as the heirs at law of Julia Sawyer, deceased.

"The court finds that the purpose of said trust was to consolidate the title in Otis Williams for the purpose of obtaining a loan with said lands as security to retire the lien against said lands for delinquent taxes.

"The court further finds that an implied trust was thereby created and brought into being by the actions of the parties and the execution and delivery of the deed by which the above undivided interests were conveyed to the defendant, Otis Williams, and that the said Otis Williams now holds legal title to said interest in said lands as trustee for the use and benefit of all of the above named parties.

"The court further finds that the purposes for which said trust was created had been accomplished and that the trust should be terminated and the respective interests of the tenants in common be determined and fixed by this decree. * * *

"The court further finds that the deed of trust executed by Otis Williams and wife to Abe J. Davidson . . . should be set aside in so far as same purports to affect the interest of any of the beneficiaries of the trust hereinabove declared, * * *." From the Chancellor's decree, appellants bring this appeal.

Evidence on the part of appellees reflected that in the year 1942, the heirs of Andrew Williams were on the verge of losing the lands. They were without money to

pay taxes of any nature, and suits having been instituted by Little Cypress Drainage District, it was necessary that a loan be obtained in order to save the property. Mr. A. M. Coates, attorney of Helena, testified that Julia Sawyer, Carrie Sanders, and Otis Williams, discussed the matter with him; that subsequently, other heirs participated in the discussion. Miss Berniece Riegel was secretary to Mr. Coates, and served in that capacity for approximately 25 years. Miss Riegel was possessed of financial means, and indicated that she might be willing to make the loan, with Mr. Coates representing her in making the arrangements. According to Mr. Coates, Miss Riegel[1] was unwilling to lend the money on account of so many undivided interests, and he suggested that the title be placed in one person, so that that person could act for all the heirs, secure the loan, and repay same through the rents and profits. According to Mr. Coates, it was understood that as soon as the indebtedness was paid, Otis Williams would reconvey the land to appellees, according to their respective interests. On April 4, 1942, a warranty deed was prepared, which was subsequently executed by Carrie Sanders, Martha Smith, Julia Sawyer, Maude Turner, Sylvester Williams and his wife, Celestine Williams, and Jelle Lee Holmes. Aline White[2] declined to join in the plan, and three of the heirs were minors. A partition suit was filed in the name of Otis Williams, the complaint asserting that Williams, by virtue of the conveyance from appellees, had become the owner of all of the lands, with the exception of the interests of Aline White and the three minors. On November 23, 1942, a decree was rendered, finding that Williams, by reason of inheritance, and the warranty deed executed by appellees, was the owner of said lands (with the exception of the interests just mentioned), and the lands were ordered sold. At the partition sale, Miss Riegel purchased the property, and then executed a quitclaim deed to Otis Williams. According to Mr. Coates,

---

[1] Miss Riegel was killed in an automobile accident on September 27, 1956, which Mr. Coates stated was the reason for his testifying in the case.

[2] This heir sold her interest in the lands to Otis Williams on December 4, 1942.

this was all a part of the plan, and agreed upon by all participants. Williams and his wife then executed their notes and a deed of trust in favor of Berniece Riegel, to secure a loan of $1,653.93, same to become due in November, 1949.

Mr. Coates stated that he first learned in 1951 that Otis Williams denied that he was holding the property in trust for appellees. At that time, Otis still owed $1,479.00. According to the witness, a house on the place burned and Miss Riegel was holding $1,000.00, which had been paid by the insurance company, and which Otis desired to be applied on his individual indebtedness.[3] Coates explained that this could not be done. ''I told her that she could not do that because that $1,000.00 belonged to the Andrew Williams heirs, and in keeping with the original agreement, she could not apply it to the individual debt of Otis Williams.'' The witness stated that he explained this thoroughly to Williams, who came to his office on several occasions. About the same time, Miss Riegel assigned, for value received, her note, together with the deed of trust, to Mr. Davidson. Coates testified that he explained to Davidson why the money could not be applied on the personal indebtedness of Williams, and also informed Davidson about the trust arrangement.

Carrie Sanders, aunt of appellant Williams, testified that she and her sister, Julia Sawyer, together with Otis, went to the office of Attorney Coates to seek advice and help in paying the drainage taxes. She stated that the deed was signed purely as a matter of obtaining the loan, and it was understood her nephew would reconvey the property when the indebtedness was paid. Mrs. Sanders stated that she explained this agreement to Martha Smith, who joined in the deed. Mrs. Sanders stayed on the property until 1950 or 1951, when she voluntarily moved.

---

[3] Williams was indebted to appellant Davidson at that time for twelve or thirteen thousand dollars, due to loans and furnishings for a long number of years.

Jesse Sawyer, son of Julia Sawyer, testified that his mother lived on the land until a short time prior to her death in 1953; that she farmed a part of the land after 1942, and that he had farmed a portion of it since 1946; that neither he nor his father had ever paid any rent to Otis Williams.

Annie Rankin, a daughter of Julia Sawyer, testified that on one occasion, she accompanied her mother, Carrie Sanders, and Otis Williams, and heard the agreement discussed (that the property would be conveyed back by Otis after the indebtedness on the land was paid).

Earl Smith, a son of Martha Smith, and grandson of Andrew Williams, testified that Otis Williams tried, in 1950, to buy his mother's interest in the property for $250.

Lula Belle Coker, a daughter of Martha Smith, testified that she was present, along with Otis Williams, Marie Vanderbilt, and Carrie Sanders, when the deed was signed; that ''Otis said that he was made the administrator over the place to get money to pay the drainage and he said, 'Just like it stands, I can't borrow no money and we have to make one the head of it and Aunt Julia and Aunt Carrie made me the head of it. * * * When all the notes have been paid, it will go back to us. * * *'''

Appellant Otis Williams (son of Frank Williams and grandson of Andrew Williams), testified that no trust agreement was mentioned, and it was never indicated that he was to reconvey the property to the other heirs at any future time. He stated that it was understood that Carrie Sanders and Julia Sawyer could continue living in the home for the rest of their lives; that he did not agree with any of the heirs to reconvey the property to them. He testified that at the time the house burned, he did not have enough money to pay off the indebtedness to Miss Riegel; that the insurance company delivered a $1,000.00 check to her, and he borrowed $479.00 from Davidson to add to the $1,000.00 in order

to settle his indebtedness with her,[4] but that Miss Riegel would not take the insurance check. She did agree to take a check for the entire amount from Mr. Davidson, and this was done. He stated that Miss Riegel would never turn the $1,000.00 check over to him. The witness admitted that while he was in the army, his Aunt Julia might have paid some taxes, and for the years 1954 and 1955, "Jesse slipped down here and paid them."

Mrs. Maude Darby, sister of Otis Williams and a resident of Chicago, testified that the deed was mailed to her and she signed it; she signed "because they was going to lose the property"; that Otis made no agreement with her to deed the property back at a later time.

Jelle Lee Holmes, a granddaughter of Andrew Williams, stated that she signed the deed in 1942, at which time Otis Williams told her that he would pay her some money later; that her brother, Sylvester, signed with the same understanding. She stated that Otis, in 1951, gave her the money that he promised.

Abe Davidson, a cotton buyer of Marvel, testified that he had been furnishing and lending tenants money for forty-two years; that he had furnished Otis Williams for a period of over fifteen years, and would take chattel and real estate mortgages as security. The witness testified that in November, 1951, Williams was indebted to him in the amount of twelve or thirteen thousand dollars. Davidson testified that Williams asked for an additional $479.00 to pay to Miss Riegel, but subsequently informed him that Miss Riegel wanted a check for the entire amount he (Williams) owed her, $1,479.00. Davidson gave the check in that amount, and received from Miss Riegel the notes and deed of trust signed by Williams. In January, 1952, Williams and his wife executed a real estate mortgage to Davidson, including the lands involved in this litigation, as security for the total indebtedness. Davidson testified that at the time of the execution of the mortgage, he had no knowledge that

---

[4] Actually, Williams, over a period of about eight years, executed several deeds of trust in favor of Miss Riegel, to secure sums advanced to him.

anyone, other than Otis Williams, was asserting any claim of ownership to the lands here involved. He stated that his brother checked the record, and found nothing to show that there were claims against the property. He denied that he had been advised that anyone was claiming any interest in the lands other than appellant Williams, and stated that he had no recollection of any conversation with Mr. Coates. His brother, Sol Davidson, testified that he had checked the records at the court house, and found nothing against the property except the Riegel mortgage; that he had never talked with Mr. Coates nor Miss Riegel either before or after the loan was made.

Appellants assert that appellees are guilty of laches, and are also estopped from attacking Williams' title. It is pointed out that the suit was instituted in the Phillips Chancery Court in June, 1956, more than fourteen years after the execution of the deed from appellees and the decree of the Chancery Court ordering sale of the lands and reciting Williams to be the owner (with the exception of the interests of Aline White and the three minors). We do not agree that the doctrine of laches has any application under the facts in this case. The fact that the deed was executed fourteen years before the institution of the litigation is of no consequence, for the indebtedness was not due to be paid until 1949, *i.e.*, appellees could not, under their agreement, have expected the deed back before that time. However, the indebtedness was not retired in 1949, Miss Riegel not being paid until 1951, and even then, the notes and deed of trust securing $1,479.00 of this indebtedness were assigned to Davidson. According to the testimony of that appellant, the indebtedness has not as yet been paid. As was stated in *Walker* v. *Biddle,* 225 Ark. 654, 284 S. W. 2d 840:

"Second, it is contended that since the Statute of Limitations, in the absence of concealment, runs in favor of the trustee of a constructive trust, *Mathews* v. *Simmons,* 49 Ark. 468, his suit is barred by the seven year statute. The answer is that the constructive trust did

not arise at the moment the deed was executed. It is the transferee's repudiation of his promise that brings the trust into being. The evidence indicates that Walker did not claim the land as his own until after his sister Mary's death in 1947; so that bar of the statute had not fallen when this suit was brought in 1952."

Appellants assert that appellees' rights, if any, are barred by the statute of limitations. This argument has reference to § 37-108, Ark. Stats., which provides that all actions against a purchaser at a judicial sale, his heirs or assigns, shall be brought within five years of the date of sale. Miss Riegel received a commissioner's deed in January, 1943, and she conveyed the lands to Otis Williams a few days later. The suit was not instituted until June, 1956. It is contended that appellees are estopped from attacking the decree in the partition suit. Appellants state that the court's decree, in the instant case, had the effect of (a) invalidating the finding of fact in the 1942 suit that Otis Williams was the owner of the property by reason of the execution of the deeds from appellees, (b) invalidating the sale and conveyance of 1942 by the commissioner appointed by the court, and (c) invalidating the deed executed by Miss Riegel to Otis Williams. We disagree with this contention. The present suit is not an attack upon the decree in partition. Appellees have not contended that the decree is void or of no judicial effect. It is simply asserted that the title which Otis Williams acquired in that proceeding was impressed with the trust which appellees here assert. Of course, Williams held legal title to the property, and if Williams had conveyed the property to an innocent purchaser, such purchaser would have acquired a fee simple title. The facts in this case do not conform to the facts in the case of *Hardy* v. *Hilton*, 211 Ark. 991, 204 S. W. 2d 163, which is cited by appellants. In other words the principle declared in that case has no application to facts that would establish a constructive trust. If the evidence was legally sufficient to establish the agreement between Williams and the appellees, *i.e.*, that Williams was only holding as trustee, then

the court action was only a part of the overall understanding between the parties in interest. According to appellees' evidence, the partition suit was agreed upon by all parties, in furtherance of the mutual objective, and this being true, when Williams purchased the property, such act was in the nature of a redemption for the benefit of all the heirs.

Appellants contend that the evidence does not meet the legal test of sufficiency to establish the trust. It is first contended that the "over-all plan" cannot be enforced under the laws of this state, since no written memorandum was prepared showing that the title was vested in Otis Williams as trustee. Appellants have reference to Section 38-106, Ark. Stats. (a part of the Statute of Frauds), which provides as follows:

"All declarations or creations of trusts or confidences of any lands or tenements shall be manifested and proven by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void; and all grants and assignments of any trusts or confidences shall be in writing signed by the party granting or assigning same, or by his last will in writing, or else they shall be void."

The very next section, however, § 38-107, provides:

"Where any conveyance shall be made of any lands or tenements, by which a trust or confidence may arise or result by implication of law, such trust or confidence shall not be affected by anything contained in this act."

For that matter, in *Armstrong* v. *Armstrong,* 181 Ark. 597, 27 S. W. 2d 88, we held that the provisions of Section 38-106 (then Section 4867, Crawford & Moses' Digest) did not apply to a constructive trust. The facts in that case were rather similar to the present litigation. From the opinion:

"Monroe Armstrong testified that there was no agreement such as claimed by the appellees, but that,

finding they would be unable to pay the $514 mortgage, they conveyed the land absolutely to him.

All the appellees, his brothers and sisters, testified in support of the allegations made by them, and their testimony was corroborated by that of disinterested witnesses, among whom was the justice of the peace who drew the deed from appellees to Monroe and took their acknowledgments. According to all this testimony, the deed was made to Monroe as the elder brother, so that he might secure money to pay the indebtedness then existing, and to manage the land and pay whatever indebtedness he might thus incur out of the rents and profits, and that, when this purpose was accomplished, he and his brothers and sisters would be the owners of the land, share and share alike. To our mind, this evidence is clear, satisfactory and convincing, and warranted the chancellor in the conclusion reached.

The contention of appellant, Monroe Armstrong, that this state of facts, if proved, would not entitle appellees to the relief prayed because of the statute of frauds cannot be sustained for the reason that the statute, § 4867, Crawford & Moses' Digest, refers to express trusts, and the facts established by the evidence in this case establish a constructive or a trust *ex maleficio,* to which the statute has no reference.

It is well settled that equity impresses a constructive trust in favor of those entitled to the beneficial interest against one who secures the legal title by means of an intentional false verbal promise, who held the same for a certain specified purpose, and having thus obtained title he retains and claims the property as absolutely his own.''

See also *Walker* v. *Biddle, supra.* Appellant asserts there is no proof of fraud in this case, and accordingly, no grounds for declaring a constructive trust. Whether appellant Williams was guilty of fraud, is here of no consequence, and requires no discussion, for proof of fraud is not essential to the establishment of a con-

structive trust. In *Robertson* v. *Robertson,* 229 Ark. 649, 317 S. W. 2d 272, this Court said:

"A grantee's oral promise to hold the land for a third person is unenforceable under the statute of frauds, but a constructive trust will be imposed if it is shown by clear, convincing and satisfactory evidence that the grantors promise was intentionally fraudulent *or that the grantor and grantee were in a confidential relationship.*"[5]

Under appellees' theory, and proof, Williams stood in a confidential relationship with his aunts and other relatives, and the evidence offered on their behalf reflects that they reposed their trust and confidence in him, were depending upon him to protect their rights, and trusted him to reconvey to them their respective interests in the land. Black's Law Dictionary, 4th Edition, defines a constructive trust as: "A trust raised by construction of law, or arising by operation of law, as distinguished from an express trust. Wherever the circumstances of transaction are such that the person who takes the legal estate in property cannot also enjoy the beneficial interest without necessarily violating some established principle of equity, the court will immediately raise a constructive trust, and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties who in equity are entitled to the beneficial enjoyment."

This brings us to a discussion of the most pertinent question in the litigation, *viz.,* was the evidence, from which the court found a constructive trust, clear, cogent, and convincing? The testimony of Attorney Coates is particularly impressive, not because he was the only witness testifying who was not a relative, or had no apparent interest in the case, but mainly because his testimony "ties in" with the circumstances that tend to throw light upon what actually transpired, and was agreed upon, between the parties. There certainly seems to be no reason why Mr. Coates would not have testified

---

[5] Emphasis supplied.

according to his best recollection; he evidently represented the entire family group, and the evidence reflects no purpose that he could have had in stating that the agreement was anything other than what he understood it to be. As to the circumstances referred to, we mention the following:

It is admitted by Otis Williams that Miss Riegel would not turn over to him the $1,000.00 check from the insurance company; Mr. Coates testified that she followed his advice in that regard, since he explained that this money, under the agreement between the parties, belonged to all of the heirs.

Several of the appellees continued to live on the land without paying any rent, though Williams testified that he permitted them to do this. There was even testimony that he paid rent to some of the heirs.

Miss Riegel purchased the property at the commissioner's sale, and then deeded it back to Otis Williams, taking a deed of trust as security for the money she advanced. This, of course, is in complete conformity with the testimony of Mr. Coates to the effect that the parties were endeavoring to place the title in one individual for the purpose of securing a loan. What other reason would Miss Riegel have for purchasing the property, except to further the agreement beween appellees and Otis Williams? Certainly, she was not trying to buy it in for herself, because, within a few days, she deeded it to Williams, and took the deed of trust. In other words, *it is obvious that the partition suit, the purchase by Miss Riegel, and the conveyance from the latter to Otis Williams, were all part of a preconceived plan.*

A very pertinent bit of evidence was the copy of a letter, offered as an exhibit, from Otis Williams to his commanding officer at Camp Robinson. This letter was written by Mr. Coates for Williams, the attorney, according to his testimony, dictating the latter to his secre-

tary, in the presence of appellant. The letter reads as follows:

"Sir:

I have recently been inducted into the United States Army and arrived here for duty Saturday, December 5th, 1942.

Before being drafted for service in the United States Army I farmed in Phillips County, Arkansas, on a tract of land of 120 acres that was owned by me and other heirs of Andrew Williams, deceased. This land is situated in a drainage district known as the Little Cypress Drainage District of Phillips County, Arkansas, and annual assessments had accumulated against the land to the extent of approximately $1,000.00. By reason of the fact that the title to the land was considerably involved with many heirs it was impossible for us to secure a loan on the land to pay the drainage district assessments and we were about to lose the land by reason of the non-payment of these assessments.

The balance of the heirs placed the matter in my hands to look after and work out for them inasmuch as they were scattered over various parts of the country and in October of this year I employed an attorney, Mr. A. M. Coates, of Helena, Arkansas, to file a suit in the chancery court there to get the title to the land straightened out so that money could be borrowed on the land to pay the drainage district assessments.

The case was heard by the Chancery Court on the 23rd day of November, 1942, and a decree rendered and the land ordered sold and the same has been advertised for sale by the Commissioner appointed by the Court on the 18th of December, 1942. The next term of the Chancery Court in Phillips County, Arkansas, will be held on the 6th of January, 1943, at which time the sale will be confirmed by the Court and then I can proceed to close the matter by completing the loan on the land and paying the assessments to the drainage district and thereby save this land for myself and the other heirs.

Inasmuch as the matter was placed in my hands by the other heirs to handle for them it will be necessary that I execute all the loan papers in order to pay the drainage district assessments after the sale has been confirmed on January 6th, 1943.

Therefore, I wish to apply for a leave of absence from the Army, the time to be so arranged that I can be in Helena, Arkansas, on January 6th and 7th, 1943, as the papers above referred to cannot be completed until the sale is confirmed by the Chancery Court.    *    *    *''

Williams testified that he never read the letter, nor was it read to him, and that he had no idea of the contents; that Coates gave it to him sealed in an envelope, and told him to give it to his commanding officer. He stated that he did not know whether he signed it. Williams did subsequently write Coates stating that, ''The letter you give me was a prince, and I will be there on the said days.'' Aside from the fact that it is difficult to conceive of Williams getting the letter from Coates, delivering it to his commanding officer, and writing back as to its effectiveness—without ever knowing the contents thereof—this evidence is also a strong circumstance substantiating the testimony of Coates. Let it be remembered that Coates was the man consulted by both Williams and appellees  Coates was the individual who prepared the deed—who instituted the 1942 complaint—who arranged the Riegel loan—and the Riegel purchase of the property. The letter, admittedly, was written approximately eight months after the conveyance from appellees, and only a few days after the Chancery Court decree of 1942, i.e., it was written at a time when the details of the agreement should have been clear in the mind of this attorney who suggested it—in fact, before the complete plan had been fully consummated,[6] and at a time when no litigation was contemplated.

One of the strongest circumstances in the record, to substantiate the agreement as contended for by appellees,

---

[6] The letter was written on December 2, 1942, which was, of course, prior to the sale of the property, the purchase by Miss Riegel at the sale, and prior to the conveyance to Williams by Miss Riegel.

is the fact that Williams, in 1951, purchased the interests of Jelle Lee Holmes, and her brother, Sylvester Williams, and each of these grantors executed a deed to Williams at that time. Both Jelle Lee Holmes and Sylvester *had joined in the deed of April 4, 1942,* and Sylvester's wife had released her dower and homestead rights. If there was no trust agreement in 1942, and the deed from appellees at that time was an outright and absolute conveyance to Otis Williams, why did he deem it necessary to obtain a second deed from Jelle Lee Holmes and Sylvester Williams? We are of the opinion that the evidence was clear, cogent, and convincing, and the Chancellor was justified in declaring a constructive trust in favor of appellees.

This leaves only the question of whether Davidson was a *bona fide* purchaser for value. Here, we leave the "clear, cogent, and convincing" rule, and determine this question on whether the Chancellor's findings were against the preponderance of the evidence. Mr. Coates stated that he advised Davidson of appellees' interest in the property at about the time the insurance check was received by Miss Riegel, and her notes assigned to Davidson, fully explaining the state of the title and the reason the insurance check could not be applied to Otis Williams' debt.[7] This appellant testified that no such discussion took place. We are unable to say that the Chancellor's finding was against the preponderance of the evidence, but we do feel that the court erred in not granting Davidson relief in the amount of the notes assigned to him by Miss Riegel, and any further amount that Davidson may have advanced to Williams solely for the use and benefit of this land. After all, Miss Riegel herself would have been entitled to the $1,479.00 from Williams, and Davidson "stands in her shoes" to

---

[7] It is interesting to note that Miss Riegel filed a bill of interpleader in the Chancery Court in August, 1952, paying into the registry of the court the $1000.00 check, asserting the agreement between appellees and appellant Williams, as herein discussed, stating that Williams had subsequently purchased the 1/6th undivided interest of Aline White and the 1/12th undivided interest each of Sylvester Williams and Jelle Lee Holmes, and stating that several of the heirs were asserting a claim to the proceeds of the check, and she was unable to distribute same without risk of liability to herself.

that extent. This is to say that Davidson is not entitled to a lien on appellees' interests in the lands for any amount of debt which was already in existence at the time he was assigned the Riegel notes, or for amounts furnished Williams because of other transactions or securities. According to Davidson, Williams was already indebted to him in the amount of twelve or thirteen thousand dollars. It is impossible to determine from this record the exact amount this appellant would be due. The cause is therefore remanded to the Chancery Court with directions to ascertain and determine the proper amount due Davidson under our holding herein. In all other respects, the decree is affirmed.