Joe T. KELLY, Mrs. Gussie R. Kelly, Mary Ethel Kelly, Elizabeth J. Kelly, Joanne Kelly, George S. Lensing, Leo A. Lensing and Captan Jack Wyly, Plaintiffs,

v.

James WEIR and Willene R. Weir, His Wife, First National Bank of Dermott, Arkansas, and McGehee Grain Drying Cooperative, Defendants.

Arkansas Grain Corporation, Intervenor.

L. J. Warren and D. D. Woods, Cross-Defendants.

No. PB-64-C-3.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

July 15, 1965.

William H. Drew, Lake Village, Ark., for plaintiffs and L. J. Warren and D. D. Woods, cross-defendants.

James M. Barker, Jr., Hamburg, Ark., for defendants, James Weir and Willene Weir.

Robert B. Gibson, Dermott, Ark., for First Nat. Bank of Dermott.

Arthur R. Macom, Stuttgart, Ark., for McGehee Grain Drying Cooperative and Arkansas Grain Corp.

HENLEY, Chief Judge.

This is another phase of the protracted and hotly contested litigation involving James Weir of Dermott, Arkansas, and his 995 acre farm located in Chicot County, Arkansas. The controversy began as one between the Government, on the one hand, and Mr. Weir, on the other hand, arising out of Mr. Weir's refusal to abide by the acreage control provisions of the Agricultural Adjustment Act of 1938, as amended, as that Act related to rice and other crops. That controversy was finally disposed of adversely to Weir. The present controversy is between Weir, as defendant, and assignees of a certificate of purchase issued by the United States Marshal for this District following an execution sale of the Weir farm in 1962 which took place when Weir refused either to pay or to supersede pending appeal the judgment which the Court had rendered in the suit which the Government had brought against Weir to collect penalties resulting from Weir's deliberate overplanting of his 1959 rice acreage allotment. The assignees of the certificate of purchase, who presently hold a Marshal's deed to the property, are plaintiffs in the instant action and are seeking to gain possession of the farm. Mr. Weir vigorously resists their claim. There is also a subsidiary controversy between plaintiffs and the Arkansas Grain Corporation and the First National Bank of Dermott involving the soybean crop which Mr. Weir produced on the farm in 1963. The raising of that crop was financed by the Bank, and the crop was purchased by the Grain Corporation. The case has been tried to the Court without a jury, and this memorandum incorporates the Court's findings of fact and conclusions of law.

The initial controversy between Weir and the Government had its genesis in 1959 when Mr. Weir had a rice allotment of ten acres. Mr. Weir deliberately overplanted that allotment very substantially and incurred penalties of approximately $17,000. In 1960 the Government filed suit in this Court to collect those penalties, the claim being resisted on a number of grounds, including the alleged unconstitutionality of the Act. A motion for summary judgment was

filed by the Government and after full consideration the Court on February 12, 1962, filed a memorandum opinion, which was not published, granting the motion. In due course judgment against Weir in the sum of $16,972.09 plus six percent interest was entered. Mr. Weir appealed from that judgment, and on November 27, 1962, the decision of the Court was affirmed. Weir v. United States, 8 Cir., 310 F.2d 149.

Mr. Weir had a right to supersede the 1962 judgment of this Court by filing a supersedeas bond. Although he would have had no difficulty in making a bond which would have been acceptable to both the Court and the Government, and although he was advised repeatedly of his right to do so and of the desirability of pursuing such a course, he consistently refused to supersede.

On February 28, 1962, at the instance of the Government a writ of execution was issued by the Clerk and delivered to the Marshal. The writ commanded the Marshal to make out of the goods, chattels, lands and tenements of Weir the principal sum of $16,972.09, plus accrued interest amounting to $1,965.92, together with costs in the amount of $59.80.

In March 1962 the Marshal's office made an unsuccessful effort to levy on personal property belonging to Weir and finally levied on his interest in the farm, which interest was the fee simple title to the land, subject to a mortgage in favor of Connecticut Mutual Life Insurance Co. and also subject to the inchoate dower interest of Mrs. Weir.

The sale of the land under the execution was duly and properly advertised, and the sale finally took place on April 17, 1962, after renewed efforts by the Government to settle the case or to induce Mr. Weir to supersede the judgment pending appeal were unsuccessful.

The highest bidder at the sale was L. J. Warren of Lake Providence, Louisiana, and the amount of his bid was $60,000. The land was sold on a credit of three months, and Mr. Warren gave bond with sureties thereon to secure the payment of the bid price within the 90 day period. The circumstances of the Warren bid and acquisition of the certificate of purchase constitute one of the issues in the instant case and will be discussed in detail later on.

Mr. Warren did not pay the amount of his bid within the 90 day period, and the Government began to press him and the sureties for payment. On September 28, 1962, Warren assigned his certificate of purchase to the present plaintiffs, namely, Joe T. Kelly, Mrs. Gussie R. Kelly, Mary Ethel Kelly, Elizabeth J. Kelly, Joanne Kelly, George S. Lensing, Leo A. Lensing, and Captan Jack Wyly, all citizens of Louisiana.

On the next day the assignees paid to the Marshal the sum of $61,639.34 including interest in satisfaction of the bid. They did not request immediate issuance of a Marshal's deed, and such a deed was not issued at the time.

The amount of the payment to the Marshal was susbtantially in excess of the sum required to satisfy the Court's original judgment in the initial case, and normally the overplus would have been paid over to Weir. However, by the time that the payment to the Marshal was made, certain other penalty claims of the Government against Weir had gone to judgment, and satisfaction of those judgments, as well as the initial one, was had out of the payment made by the assignees.

Under Arkansas law, Weir had a period of one year from the date of the sale, that is to say until April 17, 1963, to redeem. Redemption would have involved payment of the purchase price plus a penalty of 15 percent thereof and other lawful charges. Ark.Stats.1947, § 30–441. Weir did not redeem within that period. Instead, on April 19, 1963, two days after the redemption period expired, he filed a motion attacking the validity of the sale. The Court held a hearing on the motion and denied it on November 14, 1963. Weir then filed a motion for a new trial or for rehearing,

and the Court denied that motion on March 30, 1964. In connection with those motions the Court filed two memorandum opinions which were later published in combined form, and which appear as United States v. Weir, E.D.Ark., 235 F.Supp. 306. In those opinions, to which reference is hereby made, the events leading up to and transpiring at the sale are set forth in detail. Pursuant to the Court's November 1963 order, the Marshal executed and delivered his deed to plaintiffs.

Weir's appeals from the November 1963 and March 1964 orders were unsuccessful. Weir v. United States, 8 Cir., 339 F.2d 82.

■ The execution sale affected only Weir's personal interest in the farm. It did not affect the Connecticut Mutual Insurance Company's mortgage, nor did it affect the inchoate dower right of Mrs. Weir.[1] However, both Mr. and Mrs. Weir had signed the note in favor of the insurance company and both executed the mortgage. The certificate of acknowledgment appended to the mortgage reflects that Mrs. Weir in the absence of her husband acknowledged that she had executed the instrument and had waived her dower and homestead rights in the property for the purposes and considerations set forth in the instrument. This acknowledgment, coupled with Mrs. Weir's act in joining in the execution of the instrument, was sufficient under Arkansas law to waive her dower rights in the property in favor of the mortgagee even though no relinquishment of dower clause appears in the body of the instrument. Jones On Arkansas Titles, §§

829–30; Johnson v. Parker, 51 Ark. 419, 11 S.W. 681; Dutton v. Stuart, 41 Ark. 101.

While the note and mortgage reflect an indebtedness of $60,000 the record indicates that the insurance company advanced to Weir only $30,000, and by August 27, 1963, the balance due the company, including interest, was $22,843.82. On that date four of the plaintiffs purchased the note and mortgage for the sum just mentioned. The note was endorsed to them, and a formal assignment of the mortgage was executed and delivered.

■ On December 30, 1963, the assignees made formal demand on Weir to vacate the premises not later than January 4, 1964, and when he failed to do so, assignees commenced this action on January 17, 1964, against Mr. and Mrs. Weir, the First National Bank of Dermott, and the McGehee Grain Drying Cooperative.[2] As noted, Arkansas Grain Corporation intervened voluntarily, assuming the position of a defendant. All of the plaintiffs are citizens of Louisiana, all of the defendants and the original intervenor are for jurisdictional purposes citizens of Arkansas. Certain additional parties who have been brought into the case and whose interests are aligned with the plaintiffs are citizens of Louisiana and Missouri. The amount in controversy is obviously in excess of $10,000, exclusive of interest and costs. Hence, federal diversity jurisdiction is established.

It is the position of the plaintiffs that by virtue of the Marshal's deed they are the owners of Mr. Weir's interest in the

1. For that reason the Court was able to find in November 1963 that the $60,000 bid by Warren was not an unreasonably low bid. United States v. Weir, supra, 235 F.Supp. at 312–313. No one has ever contended that $60,000 would have been a fair price for the unencumbered fee simple title to the farm. Indeed the record reveals that plaintiffs have executed an option covering the property which calls for a price of more than $200,000, and the President of the First National Bank of Dermott testified at

the trial of the instant case that he is of the opinion that the property is worth $200 an acre.

2. When plaintiffs named McGehee Grain Drying Cooperative a defendant in the case, they made a mistake; they should have named Arkansas Grain Corporation. The Arkansas Grain Corporation voluntarily intervened in the case and is before the Court, and the complaint as to McGehee Grain Drying Cooperative will be dismissed.

farm and are entitled to be placed in possession thereof; that the insurance company's note and mortgage are in default and that plaintiffs are entitled to a foreclosure of the equity of redemption so as to eliminate Mrs. Weir's dower interest; that Weir should be restrained from interfering with plaintiffs' peaceable possession of the property after such possession is gained; and that the Bank and the Arkansas Grain Corporation should be required to account to plaintiffs for rent with respect to the 1963 soybean crop.

The Weirs deny that plaintiffs are entitled to any of the relief sought by them, and contend that plaintiffs should be held to be constructive trustees of the farm for the benefit of Weir. Weir concedes in this connection that he should repay the plaintiffs the moneys which they have expended in connection with their acquisition of legal title to Weir's interest in the property and in connection with the acquisition of the note and mortgage, and Mr. Weir asserts that he can raise the necessary funds if given a reasonable opportunity to do so.

The Grain Company and the Bank deny that they are liable to plaintiffs for any part of the proceeds of the 1963 crop. In this connection they contend that the crop was not subject to any lien in favor of plaintiffs, that the Bank financed the production of the crop in good faith, and that the Grain Company purchased the beans in good faith and without notice of any claim of plaintiffs to any portion of the proceeds of the crop.

### I.

The contention of Weir that plaintiffs are constructive trustees for his benefit is based primarily on an alleged oral agreement between him and L. J. Warren made in Warren's office in Lake Providence a few days before the sale took place. Plaintiffs deny the existence of any such oral agreement as Weir postulates, and they contend alternatively that if any such agreement was made it fell within the Statute of Frauds, and

that in any event it was breached by Weir.

■■ In Arkansas a constructive trust on lands may be based upon a parol agreement; but the burden is upon the party who asserts the existence of such an agreement to establish it by evidence which is clear, cogent and convincing. Davidson v. Sanders, 235 Ark. 161, 357 S.W.2d 510; Mulligan v. Payne, 232 Ark. 922, 341 S.W.2d 53; Robertson v. Robertson, 229 Ark. 649, 317 S. W.2d 272; S. & M. Oil Co. v. Mosley, 227 Ark. 250, 297 S.W.2d 926. The fourth subdivision of the Arkansas Statute of Frauds, Ark.Stats.1947, § 38–101, provides in substance that contracts relating to the sale of lands or interests therein must be in writing, but that provision is expressly made inapplicable to any conveyance by which "a trust or confidence may arise or result by implication of law." Ark.Stats.1947, § 38–107.

■■ While, as indicated, the Statute of Frauds does not apply to a trust in lands arising by implication of law, which would include both resulting and constructive trusts, not every breach of a promise made with respect to lands will give rise to a constructive trust. Before such a trust will be declared it must appear either that the promisor who later obtains title to the property never intended to perform his promise, or that there was a confidential relationship between the promisor and promisee. In Davidson v. Sanders, supra, the Court said (p. 173 of 235 Ark., 357 S.W.2d at p. 517):

"* * * In Robertson v. Robertson, 229 Ark. 649, 317 S.W.2d 272, this Court said:

" 'A grantee's oral promise to hold the land for a third person is unenforceable under the statute of frauds, but a constructive trust will be imposed if it is shown by clear and convincing [and satisfactory] evidence that the grantors (sic) promise was intentionally fraudulent or that the grantor and grantee were in a confidential relationship.' "

When the evidence in this case is considered in the light of the principles just stated, the Court is persuaded that Mr. Weir cannot prevail on the basis of a constructive trust arising out of any parol agreement with Mr. Warren.

Mr. Weir testified in substance that he and Mr. Warren agreed, in the presence of Captan Jack Wyly, who was at the moment Mr. Warren's attorney, and who later represented Weir, that Warren would bid the farm in at the sale for the benefit of Weir, and that Weir could redeem the property at any time. Although Mr. Weir, according to his testimony, expected confidently to have the funds necessary to redeem within three months after the date of sale, he insists in his testimony that his right to redeem the property without the payment of penalty was not limited to that three months period, or to the one year statutory period for redemption, or to any other period of time.

Warren and Wyly testified, on the other hand, that Warren was reluctant to bid on the property and manifested that reluctance to Weir; that Weir assured Warren that he would have the money within the three months period, and that if he did not, Warren would not be hurt because he would have the land and Weir would have the one year period to redeem. As the Court understands it, the Warren-Wyly version of the agreement is that Weir could redeem without penalty at any time within the three months credit period, but that if he failed to do so, and if Warren was required to pay the amount of his bid, then he would occupy the position of any other purchaser at an execution sale, and that the only remaining right of Weir would be to redeem the property in accordance with Arkansas law within the statutory period of redemption being required in that connection to pay the 15 percent penalty provided by the Arkansas statute previously mentioned.

The execution sale was attended by two journalists representing agricultural publications which were interested in Weir's controversy with the Government about the farm program. In early May 1962 those same journalists, who were partisans of Weir, Mr. Weir, Mr. Warren, Captan Jack Wyly, and others met together at Hugo's Steak House near Lake Providence. Weir testified and was corroborated by the newspapermen that in the course of the gathering Mr. Warren stated that he had told his wife and daughters that, regardless of anything that might happen to him, Weir was to be permitted to redeem his farm. Warren and Wyly deny that the former made any such statement.

As indicated, Weir did not redeem within the three month period and the evidence discloses that, when it became apparent that Weir would not be able to redeem within that period, Warren assigned his certificate of purchase to plaintiffs who satisfied his bid in September, thus relieving him and his sureties of their obligation on the bond which they had given to the Marshal following the execution sale.

In view of the conflict in the testimony as to the nature of the agreement between Weir and Warren, the Court is unable to say that the truth of Weir's version has been established by evidence which is clear, cogent and convincing. Indeed, the evidence does not even preponderate in favor of Weir's version. The Court thinks it quite unreasonable to believe that Warren in the circumstances would have made any such open-end agreement as Weir says was made.

Weir urges that his testimony as to the agreement and as to the statement allegedly made by Warren at Hugo's Steak House is corroborated by the testimony of the two journalists relative to the statement. The Court has considerable doubt that Warren made the statement in question. But, even if he did, the Court does not think that it has the significance that Weir would attach to it.

The evidence discloses that the meeting at the steak house was a convivial one, and the Court doubts that much weight should be given to anything said

by anyone in the course of the gathering. Also the statement was ambiguous and not inconsistent with Warren's version of the pre-sale agreement. It must be remembered that the statement was made, if at all, well within the three month credit period, to say nothing of its being well within the statutory redemption period, and at that time Weir's associates seem to have been confident that Weir could raise the money, or at least he was telling them he would be able to do so.

But, regardless of the terms of the agreement, the Court cannot find that when it was made Warren had any intention of defrauding Weir or any intention of not performing such agreement as he did make. Nor was there any confidential relationship between the two men. The most that can be said from Weir's standpoint is that Warren broke a promise relating to the Weir farm, and in the circumstances enforcement of that promise is prohibited by the Statute of Frauds. Davidson v. Sanders and Robertson v. Robertson, both supra.

Assuming arguendo, however, that the Warren-Weir agreement was what Weir says that it was, and assuming that it was enforceable, and assuming that all of the plaintiffs knew or were charged with knowledge of its terms, the Court finds itself in agreement with plaintiffs that Weir himself breached the agreement.

One thing on which both sides agree is that it was never contemplated that Mr. Warren would have to take up his bid; the money was to be supplied by Weir. And while Weir was unable to borrow additional money from the insurance company, as he had hoped to do, or elsewhere, he was by no means unable to protect his farm and to protect Warren from liability on his bond. With the means to be described at hand, Weir absolutely and stubbornly refused to avail himself of those means and left Warren confronted with the alternative of satisfying the bid or finding some person or persons who would take the certificate of purchase off of his hands. In this connection the evidence in this case and the evidence produced at the November 1963 hearing in the original case established the following facts mentioned in the 1963 opinion (pp. 311–312 of 235 F. Supp.):

"Following the sale but before the purchase money was paid to the Marshal, Mr. Wyly worked out an arrangement with the United States Attorney whereby the rice which had brought about the suit would be sold and the Government's judgment, that is to say the penalties of the Act plus interest and costs, would be paid out of the proceeds with the surplus being turned over to Weir. Had this agreement been carried out, it seems clear that Mr. Warren would have released his rights under his certificate of purchase, and that would have been the end of the matter, at least as far as this particular case was concerned. Weir, however, refused to carry out the agreement and discharged Mr. Wyly as his attorney. Mr. Weir testified that he refused to carry out the agreement because the Government insisted that it be named as a joint payee with Weir in any checks that might be given in payment for the rice. Weir stated that other farmers were not treated in that manner, and that he refused to go along with such a procedure. Acually, Weir was simply unwilling to pay the Government the amount of its judgment."

Had Mr. Weir been willing to honor the agreement made by his then attorney, no one would have been required to pay the Marshal more than the $17,000 judgment in the original case, plus interest and costs. And Weir is certainly in no position to complain that plaintiffs who were required to pay more than $60,000 were not willing to honor the agreement which for present purposes the Court has assumed, contrary to the facts, to have been made originally between Warren and Weir.

## II.

It is further contended by Weir that plaintiffs are constructive trustees because of the attorney-client relationship existing between Captan Jack Wyly and Weir during a portion of the period with which the Court is here concerned.

As has been pointed out, when Weir, Warren, and Wyly met for the first time in Warren's office in Lake Providence, Wyly was representing Warren. The Court finds from a preponderance of the evidence, however, that very shortly after that meeting and certainly prior to the sale of the land Wyly had begun to act as Weir's legal representative as well as that of Warren. And Wyly's representation of Weir continued until the relationship was terminated in the circumstances mentioned in the preceding section of this memorandum.[3]

Immediately prior to the sa'e Wyly participated in the conferences related to the possibility of the sale being settled or of Weir's filing a supersedeas bond, and it appears that Wyly was one of the individuals who advised Weir to let the sale proceed. After the sale and after it became rather evident that Weir could not borrow any more money from the Connecticut Mutual Life Insurance Company, Wyly made some efforts to find another source of funds for Weir, and also conducted the negotiations with the United States Attorney which have been described.

The attorney-client relationship between Wyly and Weir was finally terminated in early September 1962, after which Wyly arranged for the acquisition of Warren's certificate of purchase by plaintiffs, including Wyly himself. Warren was not paid anything for the certificate; the assignees simply paid the Marshal the amount necessary to satisfy the bid.

The Court finds from a preponderance of the evidence that from and after the date of the termination of the professional relationship between Weir and Wyly the latter knew that the former would not sell his rice to satisfy the judgment and knew that he could not, or very probably could not, raise funds from other sources to redeem from the sale. The Court also finds that Wyly and the remainder of the plaintiffs knew when they obtained the Warren certificate that the Weir farm was worth much more than they would be required to pay in satisfaction of the Warren bid.

The record discloses that after plaintiffs obtained their deed from the Marshal they offered to sell the farm back to Weir for $60,000, plus an additional $30,000, with a still further payment of $30,000 to be made should Weir sell the land within three years. Weir rejected that proposal.

In support of the contention now being discussed Weir invokes the settled and indeed fundamental principle that as a general rule an attorney is not permitted to acquire by purchase at an execution sale or by means of a similar

---

3. Although the interests of Weir and Warren were legally adverse so that Wyly's representation of both of them would be improper ordinarily, the Court will say that during the period of time that the dual representation continued, there was no real conflict of interest between Weir and Warren, although there was a potential conflict which might arise if Weir failed to effect a redemption within the credit period. The situation existing between the date of the sale and Weir's refusal to permit his rice to be sold to satisfy the judgment was that Weir and Warren both expected the former to produce the funds necessary to redeem the land. Wyly was interested in protecting Warren from liability on his bond, but he was also interested in helping Weir keep his farm. When Weir attacked the execution sale in 1963, Warren had already assigned his certificate of purchase to plaintiffs and was not a real party in interest as far as that attack was concerned. Thus, in mentioning the fact that Wyly for a time represented technically opposed interests the Court does not mean to stigmatize him for unethical conduct in the circumstances. The Court will add also that in connection with the sale proper Mr. Weir had the independent legal advice of Carneal Warfield, a well known attorney of Lake Village, Arkansas.

transaction an interest adverse to his client in property which is the subject of litigation with respect to which the attorney has been employed, and that this disability of the attorney continues after the termination of his employment where the acquisition is based on knowledge or information obtained in the course of the employment, and that if the attorney does so acquire such an interest in such property, he will be held a constructive trustee for the benefit of the client or former client. 7 Am.Jur.2d, Attorneys at Law, §§ 160–165; Wright v. Walker, 30 Ark. 44; West v. Waddill, 33 Ark. 575; Bank of Pine Bluff v. Levi, 90 Ark. 166, 118 S.W. 250; Crider v. Simmons, 192 Ark. 1075, 96 S.W.2d 471; Restatement of the Law, Agency 2d, § 396(c) and (d), Comment j.

Weir argues that this case falls within the principle just announced, and that since Wyly and the other plaintiffs are in a sense joint venturers, the other plaintiffs are charged with knowledge of Wyly's alleged breach of fiduciary duty, and that their interests in the acquisition are tainted with that breach to the same extent as is Wyly's own interest.

■■■ The question presented is a serious one and has given the Court some difficulty. It is at least arguable that due in part to knowledge of the situation which Wyly gained while representing Weir, he and the other plaintiffs saw a chance to reap a large profit from Weir's inability to raise funds necessary to redeem his property, apart from the sale of his rice, and from his unwillingness to sell his rice on the Government's terms, that they unconscionably availed themselves of that opportunity, and that they should be held constructive trustees.

On the other hand, the Court cannot overlook the fact that Mr. Wyly in good faith undertook to help Mr. Weir save his farm, and that Mr. Weir simply refused to be helped. Nor can the Court overlook the fact that had the plaintiffs not acquired the certificate of purchase from Warren someone else would have, or Warren himself, who was financially able although reluctant to do so, would have paid off his bid and received the Marshal's deed. Further, plaintiffs' acquisition of the certificate took place after Weir's employment of Wyly had terminated, and there is nothing to suggest that any of the other plaintiffs ever occupied any confidential relationship with respect to Weir.

While the principle on which Weir relies is a salutary one, it should not be strained unreasonably to help a man who will not help himself, and the Court thinks it would be stretching the principle too far to apply it here. Mr. Weir's reason for refusing to sell the rice may have been sound in his own mind, but it hardly justifies the Court in protecting him from the consequences of his own decision.

The Court holds, therefore, that plaintiffs are the owners of Weir's interest in the farm, and, subject to what is about to be said relative to the mortgage, are entitled to be put in the peaceable possession thereof free and clear of all claims of Mr. Weir.

### III.

■■■ The endorsement on the mortgage note and the assignment of the mortgage were executed by John E. Downey, who is described as the insurance company's Supervisor of Agricultural Loans. When those documents were offered in evidence by plaintiffs, counsel for Weir objected to their introduction on the ground that they were not properly authenticated, by which the Court understands that counsel contends that there is no evidence that Mr. Downey was an officer or employee of the insurance company having authority to endorse the note and assign that instrument and the mortgage. It would perhaps have been well for plaintiffs to have made a somewhat better record on this point by means of pre-trial requests for admissions or by taking the deposition of Mr. Downey. However, there is evidence of record that the consideration for the assignment was in fact paid to the insurance company, and the assign-

ment and other documents were transmitted to plaintiffs in the regular course of business. The Court thinks that this is sufficient to justify the inference that Downey did have authority to assign the obligation and to endorse the note. As a matter of fact, the Court does not understand that Weir seriously contends that plaintiffs are not the holders of his obligation to the insurance company.

■ Plaintiffs' prayer for foreclosure brings up the question of merger of estates. In real property law the doctrine of merger is that whenever a greater or a less estate meet in the same person without an intermediate estate, the lesser estate is or may be merged with the greater to the extinction of the former. 19 Am.Jur., Estates, § 135; 31 C.J.S. Estates § 123b. The problem may arise in a mortgage context in either of two situations. A mortgagee may acquire by purchase or otherwise the mortgagor's equity of redemption; or a person who acquires the equity of redemption may subsequently acquire the mortgage lien. When the doctrine of merger is applied to such an acquisition, the result is normally to extinguish the mortgage debt. 59 C.J.S. Mortgages §§ 367 and 439.

The Supreme Court of Arkansas has considered the question of the merger of the mortgage estate with the equity of redemption in a number of cases. See Commonwealth Building & Loan Ass'n v. Martin, 185 Ark. 858, 49 S.W.2d 1046; Warren Cotton Oil & Mfg. Co. v. Sullivan, 180 Ark. 90, 20 S.W.2d 626; Cowling v. Britt, 114 Ark. 175, 169 S.W. 783; Neff v. Elder, 84 Ark. 277, 105 S.W. 260; Sturdivant v. Cook, 81 Ark. 279, 98 S.W. 964; Cohn v. Hoffman, 45 Ark. 376; Bourland v. Wittich, 38 Ark. 167.

■ Those cases indicate in general that the doctrine of merger is not favored and will not be applied in the absence of an intent on the part of the person acquiring both estates to effect a merger and extinguish the mortgage, or unless application of the doctrine is required by the equities of a particular case.

In Commonwealth Building & Loan Ass'n v. Martin, supra, certain land was mortgaged by the owner to Progressive Building & Loan Association. Subsequently, Commonwealth obtained a judgment against the owner which was a lien on the property. Thereafter, the owner sold the land to one Reed, who assumed Progressive's mortgage. Still later, Reed conveyed to plaintiff, Mrs. Martin, and later still she satisfied Progressive's mortgage. Later on, litigation developed between Mrs. Martin and Commonwealth, the latter contending that its judgment lien was superior to the former's rights. In upholding a decree for Mrs. Martin the Supreme Court of Arkansas said (pp. 863–864 of 185 Ark., 49 S.W.2d at p. 1048):

"The general rule is that the lesser estate in land will merge in the greater whenever the two estates are owned by the same person. This rule, however, does not apply where such merger would be inimical to the interests of the owner; hence, unless the intention to merge with knowledge of a junior lien or liens clearly appears, no merger results from the acquirement by the holder of a senior mortgage of the interests of the mortgagor, and the senior mortgage retains its priority as against all junior or intervening liens upon the mortgaged property; and this rule is true whether the interest of the mortgagor is the legal title to the land, or the mere equity of redemption. Haggerty v. Wagner, 148 Ind. 625, 48 N.E. 366, 39 L.R.A. 384.

"The doctrine above announced is supported by the weight of authority and numerous decisions announcing and applying it have been cited by counsel for appellee in his brief. Among these are the following cases: Mallory v. Hitchcock, 29 Conn. 127; Smith v. Dinsmoor, 119 Ill. 656, 4 N.E. 648; Artz v. Yeager, 30 Ind. App. 677, 66 N.E. 917; Putnam v. Collamore, 120 Mass. 454; Tucker v. Crowley, 127 Mass. 400; Bell v.

Tenny, 29 Ohio St. 240; Senter v. Senter, 87 Ohio St. 377, 101 N.E. 272; Dollar Sav. Bank v. Burns, 87 Pa. 491; Harris v. Masterson, 91 Tex. 171, 41 S.W. 482.

"The appellant has shown no equity in this case calling for the application of the doctrine of merger, and, on the other hand, its application would work a manifest injustice to the appellee which ought not to be done. Simpson v. Robinson, 37 Ark. 132. In many cases it has been our policy to apply the doctrine of subrogation, where, by so doing, the ends of justice will be met, Chaffe v. Oliver, 39 Ark. 531; Cohn v. Hoffman, 45 Ark. 376; Neff v. Elder, 84 Ark. 277, 105 S.W. 260, 120 Am.St.Rep. 67; Beauchamp v. Bertig, 90 Ark. 351, 119 S.W. 75, 23 L.R.A.(N.S.) 659; Southern Cotton Oil Co. v. Napoleon Hill Cotton Co., 108 Ark. 555, 158 S.W. 1082, 46 L.R.A.(N.S.) 1049; Rowland v. Griffin, 179 Ark. 421, 16 S.W.(2d) 457, and to deny mergers where an injustice would follow.

"In the case of Bemis v. First Nat. Bank, 63 Ark. 625, 40 S.W. 127, 129, it is said: 'It is admitted in argument, and cannot be successfully controverted, that a merger will never be presumed against the interest of the party taking the deed; but it is claimed that "this rule only applies in the absence of evidence tending to show a merger." That is a mild way of stating it. Mergers are not favored either in courts of law or of equity, and it requires evidence to show that the interest of him who holds both rights will not be prejudiced, before the rule allowing a merger will be applied; and it is hardly sufficient that the evidence tends to show a case for the application of the rule. We do not intend by this discussion to admit that the evidence shows this to be a case where a merger can be made, but, rather, how far the courts will lean towards the real in-

terest of the holder of the two rights; and, in doing so, how strong the evidence must be to sustain the merger.' "

The Court is convinced that in the instant case no merger took place when plaintiffs acquired the insurance company's mortgage after having acquired Weir's equity of redemption at the execution sale.

It is clear that plaintiffs intended no merger or extinguishment of the mortgage debt; on the contrary one of the reasons why they acquired the mortgage was their desire to foreclose it so as to cut off Mrs. Weir's right of dower and homestead. Nor does the Court see that there are any equitable considerations here present which call for the application of the merger doctrine. Mrs. Weir has not changed her position in the case and is not entitled to have reinstated the rights which she voluntarily relinquished, merely because the mortgage has now come into the hands of plaintiffs.

Judgment on the mortgage note will be entered, and the mortgage lien will be foreclosed. Of course, Mrs. Weir has a right to redeem so as to protect her dower and homestead interests, and she and her husband have a right to bid at the foreclosure sale, if there is one.

### IV.

As to plaintiffs' claim for rent with respect to the 1963 crop, it appears that in 1963 Mr. Weir's crop was sold for $25,364.61. Weir is liable personally for rent for the use of the land during 1963, and the Court finds that one-fourth of the value of the crop is fair and reasonable and is the percentage of the value which is customarily paid as rental for soybean lands.

The Court does not agree with plaintiffs, however, in their contention that the Grain Corporation and the Bank are liable for the rent in question.

In Arkansas growing crops are deemed to be real property in the ab-

sence of a constructive severance. After actual severance from the soil they are deemed to be personalty. A trespasser or adverse holder of land has no title to growing crops as against the owner of the land, but after severance such trespasser or holder has good title to crops actually produced and harvested by him so that his vendee or mortgagee takes free from any claim of the landowner. The trespasser or adverse holder is, of course, liable personally to the owner of the land for rent. See Mitchell v. Martindill, 209 Ark. 66, 189 S.W.2d 662; Western Union Telegraph Co. v. Bush, 191 Ark. 1085, 89 S.W.2d 723, 103 A. L.R. 367; Haffke v. Hempstead County Bank & Trust Co., 165 Ark. 158, 263 S.W. 395; Arnold v. Grigsby, 158 Ark. 232, 249 S.W. 584; Lee v. Bandimere, 140 Ark. 277, 215 S.W. 635; Eades v. Simpson, 127 Ark. 162, 191 S.W. 953; Bethea v. Jeffres, 126 Ark. 194, 189 S.W. 666, L.R.A.1918A, 549.

■■ Plaintiffs' claim against the Grain Corporation and the Bank is based on the Arkansas Landlord's Lien Statute, Act 67 of 1868, Ark.Stats.1947, § 51–201 et seq. That reliance is misplaced since the statute applies only in situations where there exists a landlord tenant relationship created by an express or implied contract. No such relationship has ever existed between plaintiffs, on the one hand, and Weir, on the other hand. Weir is a judgment debtor who has remained in possession following the sale of his property under execution. It is well settled in Arkansas that the situation just described is not one to which the lien statute is applicable. J. H. Askew & Co. v. Lindsey, 172 Ark. 551, 289 S.W. 769; Van Pelt v. Russell, 134 Ark. 236, 203 S.W. 267; Love v. Cahn, 93 Ark. 215, 124 S.W. 259; Tucker v. Byers, 57 Ark. 215, 21 S.W. 227. Hence, plaintiffs' claim against both the Bank and the Grain Corporation must be dismissed.

To recapitulate, the Court finds and concludes that by virtue of their purchase at the execution sale plaintiffs became and are the owners of Mr. Weir's interest in the farm, that is to say, plaintiffs as execution purchasers own the fee simple title to the land, subject to the inchoate dower interest of Mrs. Weir, and subject to the unmerged mortgage estate which four of the plaintiffs now own. Those four plaintiffs are entitled to a money judgment against both Mr. and Mrs. Weir for the balance of the mortgage debt and to have the mortgage foreclosed.

If a foreclosure sale becomes necessary and if the plaintiffs or some of them are the purchasers at that sale, and if the sale is confirmed, plaintiffs will be entitled to an appropriate writ or order putting them in possession of the property, and they will also probably be entitled to an order restraining Weir from interfering with their possession.

However, in view of an at least theoretical possibility that some person or persons other than the plaintiffs will acquire the property at the foreclosure sale and will be entitled to possession of the premises, the Court considers that it would be premature to enter a possessory order until the foreclosure proceedings are terminated.

All of the plaintiffs are entitled to a money judgment against Weir for the 1963 rent on the farm, and Weir may have to account for rents with respect to 1965. There is no evidence of record from which the Court can make an award for 1964 rent. As indicated, the claims of plaintiffs against the McGehee Grain Drying Cooperative, the Arkansas Grain Corporation, and the First National Bank of Dermott will be dismissed.

A decree in accordance with the foregoing will be entered. The Court will reserve jurisdiction of the case for the purpose of entering such further orders, including orders relating to possession, as seem necessary or appropriate. While the decree to be entered at this time will not terminate the case, it is believed that the decree, taken in connection with this opinion, will resolve the basic issues between the parties and may well constitute a final appealable judgment.